# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SUSAN WEINSTEIN, et al.,     )

                             )

        Plaintiffs,     )

                             )

        v.     )     Civil Action Number 00-2601 (RCL)

                             )

THE ISLAMIC REPUBLIC OF IRAN,     )
et al.,     )

                             )

        Defendants.     )

**FILED**

**FEB  6 2002**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION

This wrongful death action against the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and three senior officials of the Iranian government arises from an act of state-sponsored terrorism. The decedent, a United States citizen named Ira Weinstein, was killed in the terrorist bombing of the Number 18 Egged passenger bus in Jerusalem, Israel on February 25, 1996. The plaintiffs, who are family members and administrators of Ira Weinstein's estate, have brought this action pursuant to the Foreign Sovereign Immunities Act ("FSIA") of 1976, 28 U.S.C. § 1602-1611.

The FSIA grants federal courts jurisdiction over suits involving foreign states and their officials, agents, and employees in certain enumerated instances. In particular, the FSIA creates a federal cause of action for personal injury or wrongful death resulting from acts of state-sponsored terrorism. 28 U.S.C. §1608(e) (giving federal courts jurisdiction over suits "in which money damages are sought against a foreign state for personal injury or death that was caused by

2 2

an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of

material support or resources . . . for such an act if such act or provision of material support is

engaged in by an official, employee, or agent of such foreign state while acting within the scope

of his or her office, employment, or agency[.]").  The statute explicitly eliminates foreign

governments' sovereign immunity in suits for money damages based on extrajudicial killings and

provides that "[a]n official, employee, or agent of a foreign state designated as a state sponsor of

terrorism . . . shall be liable to a United States national or the national's legal representatives for

personal injury or death caused by acts . . . for which the courts of the United States may

maintain jurisdiction[.]"  28 U.S.C. § 1605(a)(7); 28 U.S.C. § 1605 note, Civil Liability for Acts

of State Sponsored Terrorism.

It is worth noting that two recent cases before this Court that were brought under the

FSIA involved the same terrorist bombing that killed Ira Weinstein.  In Eisenfeld v. Islamic

Republic of Iran, 172 F. Supp.2d 1 (D.D.C. 2000), and Mousa v. Islamic Republic of Iran, Civil

Action Number 00-2096 (WBB), this Court held the same defendants in the present case jointly

and severally liable for the deaths of two other American citizens, Matthew Eisenfeld and Sara

Rachel Duker, and for the injuries sustained by Leah Mousa.  All three individuals, like Ira

Weinstein, were aboard the Number 18 Egged bus when it was bombed on February 25, 1996.

The defendants, despite being properly served with process pursuant to 28 U.S.C. § 1608,

have failed to enter an appearance in this matter.  As a result, the Court entered default against

the defendants on July 16, 2001, pursuant to 28 U.S.C. § 1608(e) and Federal Rule of Civil

Procedure 55(a).  Notwithstanding indicia of the defendants' willful default, however, the Court

is compelled to make further inquiry prior to entering a judgment by default against them.  As with actions against the federal government, the FSIA requires that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief that is satisfactory to the Court."  28 U.S.C. § 1608(e).

Accordingly, the Court has engaged in a careful review of the evidence presented in this case, in light of Eisenfeld, Mousa, and the other reported cases brought under the antiterrorism provisions of the FSIA.  Wagner v. Islamic Republic of Iran, 172 F. Supp.2d 128 (D.D.C. 2001); Jenco v. Islamic Republic of Iran, 154 F. Supp.2d 27 (D.D.C. 2001); Sutherland v. Islamic Republic of Iran, 151 F. Supp.2d 27 (D.D.C. 2001); Daliberti v. Islamic Republic of Iran, 146 F. Supp.2d 19 (D.D.C. 2001); Elahi v. Islamic Republic of Iran, 124 F. Supp.2d 97 (D.D.C. 2000); Anderson v. Islamic Republic of Iran, 90 F. Supp.2d 107 (D.D.C. 2000); Cicippio v. Islamic Republic of Iran, 18 F. Supp.2d 62 (D.D.C 1998); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1 (D.D.C. 1998); Alejandre v. Republic of Cuba, 996 F. Supp. 1239 (S.D. Fla. 1997). Based upon the extensive evidence presented by the plaintiffs, the Court concludes that they have established their claim and right to relief as set forth below.

## I.    FINDINGS OF FACT

The Court heard testimony in this matter on December 6 and 7, 2001.  The plaintiffs proceeded in the manner of a bench trial and the following findings of fact are based upon the sworn testimony and documents entered into evidence in accordance with the Federal Rules of Evidence.  Plaintiffs have "established [their] claim or right to relief by evidence that is

satisfactory to the Court," as required by 28 U.S.C. § 1608(e).  The Court finds the following facts to be established by clear and convincing evidence, which would have been sufficient to establish a prima facie case in a contested proceeding.

(1) Ira William Weinstein was born on December 4, 1942, in the United States of America.  He was a United States citizen from the time of his birth until his death on April 13, 1996.

(2) Plaintiff Susan Weinstein is the widow of decedent Ira Weinstein.  She is, and at all relevant times was, a citizen of the United States.  She brings this action in her own right, as Co-Administrator of the Estate of Ira Weinstein, and as the natural guardian of plaintiff David Weinstein.

(3) Plaintiff Jeffrey A. Miller, who is also a citizen of the United States, brings this action as Co-Administrator of the Estate of Ira Weinstein.

(4) Plaintiff Joseph Weinstein is the son of decedent Ira Weinstein.  He is, and at all relevant times was, a citizen of the United States.

(5) Plaintiff Jennifer Weinstein Hazi is the daughter of decedent Ira Weinstein.  She is, and at all relevant times was, a citizen of the United States.

(6) Plaintiff David Weinstein is the son of decedent Ira Weinstein.  He is, and at all relevant times was, a citizen of the United States.

(7) Ira Weinstein, who had served in the United States Navy, worked as a butcher for the Supersol supermarket chain in Israel at the time of his death.

(8) On February 25, 1996, Ira Weinstein boarded the Number 18 Egged bus in Jerusalem, Israel to go to work.

(9) At approximately 6:45 a.m. Jerusalem time, while Ira Weinstein was still aboard, Magid Wardah, another passenger, detonated an explosive charge which, at the direction of HAMAS, he had carried onto the bus concealed in a travel bag.  The ensuing explosion caused the complete destruction of the bus, resulted in debris being hurled in excess of 100 meters, and led to the injury and death of numerous individuals, including Ira Weinstein.  Nails were placed in the bomb so that it would cause even more injuries than a typical bomb would inflict.

(10) Medical personnel evacuated Ira Weinstein from the site of the bombing to Hadassah Hospital in Jerusalem.  Doctors treated Ira Weinstein in the emergency room of the hospital for 1 ½ hours and then admitted him into the intensive care unit, where he stayed until his death on April 13, 1996.

(11) Despite all of his injuries, which are detailed below, Ira Weinstein was conscious upon arrival at the hospital, and remained at least semi-conscious for the majority of his time at Hadassah Hospital.

(12) Dr. Charles Sprung was responsible for Ira Weinstein's medical care at Hadassah Hospital.  Dr. Sprung is the director of the general intensive care unit at Hadassah Hospital and is one of the world's foremost experts on severe trauma injuries, including bomb blast injuries and burns.  In addition, Dr. Sprung has extensive teaching experience in the field of severe trauma injuries and conditions resulting from bomb blasts, and has conducted a substantial amount of research and published numerous articles in the field.  The findings of fact made by the Court

with respect to the injuries sustained by and treatment given to Ira Weinstein are based primarily on the testimony of Dr. Sprung.

(13) To a reasonable degree of medical certainty, Ira Weinstein endured extreme and conscious pain and suffering for forty-nine days, from the time of the explosion on February 25, 1996, until his death on April 13, 1996.

(14) Specifically, Ira Weinstein suffered severe and painful injuries from the bomb blast itself. The explosion resulted in such pressure within the confines of the bus that portions of Ira Weinstain's skin were literally ripped from his body. Ira Weinstein suffered an extreme amount of pain as a result of this injury. The blast also caused second to fourth degree burns to 30-35 percent of Ira Weinstein's body, including on his legs, chest, face, and hands. These burns required debridements (the procedure of cleaning out and taking off dead skin caused by burns) and skin grafts every one to three days, and the burn dressings also needed to be changed on a regular basis. All of this treatment caused Ira Weinstein to experience severe pain and to suffer greatly.

(15) As a result of the bomb blast, Ira Weinstein also sustained severe injuries to his lungs that caused him to suffer respiratory distress and failure. Upon his arrival at the hospital, Ira Weinstein had to be intubated, he had to have chest tubes inserted, and he had to be placed on a ventilator so that he could breathe. Ira Weinstein endured pain as a result of all of these things as well. Moreover, the treatment of Ira Weinstein was complicated because burn injuries are generally treated with fluids while limiting the amount of fluid intake, conversely, is the treatment for lung and respiratory injuries.

(16) As a result of his injuries, Ira Weinstein developed infections that caused further complications.  The most devastating side effect from the infections was low blood pressure, which at times caused him to go into shock and to be near death.  Further, bomb blast injuries and burns are usually treated with high doses of pain medication.  This could not be done in Ira Weinstein's case, however, because pain medication lowers blood pressure, and since his blood pressure was already low, the pain medication itself could have killed him.  Thus, Ira Weinstein could not receive an adequate amount of pain medication and, consequently, suffered a higher level of pain throughout his stay at the hospital than a patient with his injuries otherwise would have endured.

(17) Ira Weinstein also had to have surgery to relieve abdominal swelling that was caused by excess air pushed downward from his chest area.  Doctors were unable, however, to close his abdomen following surgery because of the other injuries he had sustained and the pressure problems that he had.

(18) Ira Weinstein also suffered from abnormal bleeding, which was likely caused by the damage to his lungs.  The abnormal bleeding resulted in tremendous swelling of his eyelids, face, and head.  The abnormal bleeding further led to extensive clotting that required Dr. Sprung and his staff to perform intermittently a procedure to suction out clots that were developing in his lungs.  The procedure, which included the insertion of a tube into Ira Weinstein's windpipe to extract the blood clots, was very painful.  Further, while a normal person may only have needed to be suctioned twice every eight hours, Ira Weinstein at various times had to be suctioned several times in an hour because of the abnormal bleeding he was experiencing.

(19) As a result of the infections Ira Weinstein developed (and to prevent future infections), he had both legs amputated on April 11, 1996.

(20) On April 13, 1996, Ira Weinstein died as a result of the injuries he sustained in the bombing of the Number 18 Egged bus.

(21) Dr. Sprung met with the family on a daily basis and kept them updated as to Ira Weinstein's condition.  Dr. Sprung testified that Ira Weinstein's family appeared devastated during his stay at Hadassah Hospital.

(22) Plaintiffs Susan Weinstein, Joseph Weinstein, Jennifer Weinstein Hazi, and David Weinstein were informed of the attack and the injuries sustained by Ira Weinstein on February 25, 1996.  They visited Ira Weinstein at Hadassah Hospital numerous times.

(23) HAMAS publicly claimed credit for the February 25, 1996 attack on the Number 18 Egged bus shortly after the bombing.  Statements made by Hassan Salamah, the HAMAS member who planned the attack, to Israeli police verified this claim.  Salamah later corroborated HAMAS' responsibility for the bombing in an interview with the CBS Television news program *60 Minutes*.

(24) HAMAS, the popular name for the Islamic Resistance Movement, is an organization supported by The Islamic Republic of Iran, dedicated to the waging of Jihad, or a holy war employing terrorism with the object of seizing the leadership of the Palestinian people and asserting sovereignty and the rule of the Muslim religion over all of Palestine, including all territory of the State of Israel.

(25) The affidavit testimony of Dr. Reuven Paz and Dr. Patrick Clawson establishes conclusively that the defendants knew of the destructive purposes and objectives of HAMAS, which were set forth in detail in the organization's charter introduced into evidence as Exhibit B to Plaintiff's Exhibit # 1.

(26) Notwithstanding the destructive purposes and objectives of HAMAS, the Islamic Republic of Iran gave the organization at least $25-$50 million in 1995 and 1996, and also provided other groups with tens of millions of dollars to engage in terrorist activities. In total, Iran gave terrorist organizations, such as HAMAS, between $100 and $200 million per year during this period. The money, among other things, supported HAMAS' terrorist activities by, for example, bringing HAMAS into contact with potential terrorist recruits and by providing legitimate front activities behind which HAMAS could hide its terrorist activities. In fact, this was a peak period for Iranian economic support of HAMAS because Iran typically paid for results, and HAMAS was providing "results" by committing numerous bus bombings such as the one on February 25, 1996.

(27) The conclusion of Dr. Paz and Dr. Clawson that the Islamic Republic of Iran had given material support to HAMAS was further supported by the statements of Hassan Salamah to the Israeli Police and to the CBS reporter during the *60 Minutes* interview. In the *60 Minutes* interview, Salamah projected himself as relaxed and satisfied with his supervision of the murder of 50 people, including decedent Ira Weinstein. In those statements, Salamah further explained that after joining HAMAS he went to the Sudan for indoctrination training, following which he was sent to Syria, from where he was transported by Iranian aircraft to a base near Tehran.

Osamah Hamdan, the official representative of HAMAS in Iran, met him in Tehran.  For three months, Iranian military instructors, assisted by translators, trained Salamah at the base outside Tehran in the use of explosives, automatic weapons, hand grenades, RPG and LAW missiles, terrorist methods of ambush, deactivation of land mines for extraction of explosive material, and trigger mechanism for various explosive materials.  He sketched out two similar mechanisms, one of which was used in an operation at Gush Qatif in the Gaza Strip in 1995.  According to the statements, he received all of his training in the use of explosives in Iran.  The statements also include mention of meeting with Mohammed Deif, commander of the military, terrorist wing of HAMAS.  Following completion of training, Salamah was sent back to Israel so that he could carry out terrorist attacks, such as the one on the Number 18 Egged bus on February 25, 1996.

(28) Defendant the Islamic Republic of Iran is a foreign state and has been designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j) continuously since January 19, 1984.

(29) Defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani, and Ali Fallahian-Kuzestani were high officials of the Islamic Republic of Iran on February 25, 1996.  They were aware of, consented to, and were involved in Iran's support for HAMAS during the performance of their official duties.  In particular, their approval would have been necessary to carry out the economic and other commitment of Iran to HAMAS, including the training of HAMAS terrorists in Iran.

(30) Defendant the Iranian Ministry of Information and Security is the Iranian intelligence service, functioning both within and beyond the territorial borders of Iran.  Acting as an agent of

the Islamic Republic of Iran, the Iranian Ministry of Information and Security performed acts within the scope of its agency, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note, which caused the death of Ira Weinstein. The Iranian Ministry of Information and Security acted as a conduit for the Islamic Republic of Iran's provision of funds to HAMAS and training to the terrorists under the direction of HAMAS, including Hassan Salamah.

(31) Ira Weinstein's death was caused by a willful and deliberate act of extrajudicial killing in that it was the result of an explosion of material carried aboard the Number 18 Egged bus on February 25, 1996, and intentionally detonated by Magid Wardah at approximately 6:45 a.m. Jerusalem time, acting under instructions from Hassan Salameh, who was acting as an agent of HAMAS.

(32) As a result of Ira Weinstein's death, his Estate suffered a loss of accretions that could have been expected to occur during the course of his anticipated life expectancy in the amount of $248,164.00.

(33) As a result of Ira Weinstein's death, his surviving wife and children have suffered and will continue to suffer severe mental anguish and the loss of his society and companionship. Indeed, despite being emotionally and psychologically taxing to do so, all of the family member plaintiffs testified extensively about the mental anguish they have suffered as a result of Ira Weinstein's death.

## II.    CONCLUSIONS OF LAW

A.  Subject Matter Jurisdiction—The FSIA Controls This Action

As this Court noted in Flatow, an action brought against a foreign state, its intelligence service acting as its agent, and three of its officials, acting in their official capacities, must be brought under the FSIA.  Flatow, 999 F. Supp. at 10.  See also Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993) (noting that "[u]nder the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States court; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state.").  Indeed, the FSIA must be applied in every action involving a foreign state defendant.  Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 489 (1983); 28 U.S.C. § 1330.  That is, the sole bases for subject matter jurisdiction in an action against a foreign state defendant are the FSIA's enumerated exceptions to immunity.  Argentine Republic v. Amerada hess Shipping Corp., 488 U.S. 428 (1989).  Accordingly, this Court lacks jurisdiction over this matter unless it falls within one of the FSIA's enumerated exceptions to foreign sovereign immunity.  Nelson, 507 U.S. at 355.

The FSIA has been construed to apply to individuals for acts performed in their official capacity on behalf of either a foreign state or its agency or instrumentality.  El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996) (citing Chuidian v. Phillipine Nat'l Bank, 912 F.2d 1095, 1099-1103 (9th Cir. 1990).  In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, which abrogates the immunity of foreign states for their sponsorship of terrorist acts.  28 U.S.C. §1605.  Specifically, Congress amended the FSIA to eliminate the immunity of those foreign states officially designated as state sponsors of terrorism by the

Department of State, if the foreign state so designated commits a terrorist act, or provides

material support and resources to an individual or entity that commits such a terrorist act, which

results in the death or personal injury of a United States citizen.  28 U.S.C. § 1605(a)(7).  Based

on the foregoing authority, the Court concludes that it has jurisdiction over the subject matter of

this action.

      B.  Personal Jurisdiction

      This Court has *in personam* jurisdiction over foreign state sponsors of terrorism under 28

U.S.C § 1605(a)(7).  As the Court noted in Flatow, the FSIA provides that personal jurisdiction

over defendants will exist where a plaintiff establishes the applicability of an exception to

immunity pursuant to 28 U.S.C. § 1604, §1605, or § 1607, and service of process has been

accomplished pursuant to 28 U.S.C. § 1608.  Flatow, 999 F. Supp. at 19.  Plaintiffs have

demonstrated by clear and convincing evidence that § 1605(a)(7) of the FSIA applies in this

action, and that service of process was properly accomplished pursuant to 28 U.S.C. § 1608.

      C.  The Actions of the Defendants

      A foreign state may be liable under the FSIA when there is injury from a terrorist act, that

act was perpetrated by the designated state or an agent receiving material support from the

designated state, the provision of support was an act authorized by the foreign state, the foreign

state has been designated as one providing material support to terrorism, either the victim or the

plaintiff was a United States national at the time of the terrorist act, and similar conduct by the

Untied States, its agents, officials or employees within the United States would be actionable.  In

this case, all of these elements have been demonstrated by clear and convincing evidence. 28 U.S.C. § 1605(a)(7); 28 U.S.C. § 1605 note.

The action of the HAMAS agent in detonating an explosive charge on the Number 18 Egged bus on February 25, 1996 falls within the scope of the Torture Victim Protection Act of 1991. The Court finds that it was a "deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples."

There is no question that HAMAS and its agents received massive material and technical support from the Islamic Republic of Iran. The sophistication demonstrated in the use of a relatively small explosive charge with such devastating effect indicates that it is unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran. Thus, the defendants not only provided the terrorists with the technical knowledge required to carry out the February 25, 1996 attack on the Number 18 Egged bus, but also gave HAMAS the funding necessary to do so. Further, as of February 25, 1996, Iran was a nation designated by the United States Department of State as providing material support for terrorism and Ira Weinstein was an American national.

Finally, it is beyond question that if officials of the United States, acting in their official capacities, provided material support to a terrorist group to carry out an attack of this type, they would be civilly liable and would have no defense of immunity. Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

D. Damages

(1) Wrongful Death.  The plaintiffs produced comprehensive affidavit testimony from Professor Adrian Ziderman detailing the loss of accretions to the Estate of Ira Weinstein.  These calculations were based on conservative procedures and assumptions.  In accordance with Professor Ziderman's affidavit and the report attached thereto, the Court concludes that judgment should be entered for this element of damages for the Estate of Ira Weinstein in the amount of $248,164.00.

(2) Survival Action—Pain and Suffering.  The Court has no difficulty, based on the testimony of Dr. Sprung, finding that Ira Weinstein endured extreme pain and that he suffered greatly from the time of the explosion on February 25, 1996, until his death on April 13, 1996. As Dr. Sprung noted, during his seven-week stay at Hadassah Hospital, Ira Weinstein underwent several surgical procedures which were very painful, including the amputation of both legs, and he suffered immense pain as a result of extensive burn and blast injuries.  Moreover, because of his particular medical condition, doctors did not provide Ira Weinstein with as much pain medication as they otherwise would have given to someone with the types of injuries he sustained.  Consequently, Ira Weinstein endured even more pain than individuals normally would experience with severe burn and blast injuries.

Despite the overwhelming evidence concerning the extent of Ira Weinstein's injuries and the amount of pain and suffering he endured, it is difficult for the Court to determine the appropriate amount of damages to award as compensation for this pain and suffering.  As one court aptly noted, "there is no market where pain and suffering are bought and sold, nor any

standard by which compensation for it can be definitely ascertained, or the amount actually endured can be determined[.]"  St. Louis S.W. R. Co. v. Kendall, 169 S.W. 822, 824 (Ark. 1914). This is because "[t]he nature of pain and suffering is such that no legal yardstick can be fashioned to measure accurately reasonable compensation for it.  No one can measure another's pain and suffering; only the person suffering knows how much he is suffering, and even he could not accurately say what would be reasonable compensation for it.  Earning power and dollars are interchangeable; suffering and dollars are not."  Herb v. Hallowell, 154 A 582, 584 (Pa.1931). Indeed, it goes without saying that no monetary judgment would truly compensate Ira Weinstein for the pain and suffering he endured as a result of the terrorist attack on the Number 18 Egged bus on February 25, 1996.  Nor could any court fashion a remedy that would have ameliorated the pain and suffering that Ira Weinstein endured for those forty-nine days at Hadassah Hospital.

Notwithstanding the inherent difficulty and subjectivity involved in awarding damages based on the pain and suffering of a claimant, compensation is required once liability has been determined and in this case such compensatory damages are certainly warranted.  Because there is no precise methodology used to calculate damages for pain and suffering, however, the trier of fact (which in this case is the Court) has a significant amount of discretion in determining what is appropriate compensation.  Taylor v. Washington Terminal Co., 409 F.2d 145 (D.C. Cir. 1969); Hysell v. Iowa Public Service Co., 559 F.2d 468, 472-73 (8th Cir. 1977).  In making this determination, the Court will not simply award what it abstractly finds to be fair.  Rather, in deciding the amount of damages to award in this case, the Court will look at damage awards for pain and suffering in other cases brought under the FSIA and also in personal injury lawsuits

arising under a variety of circumstances. See e.g., Eisenfeld, 172 F. Supp.2d at 8 (awarding $1,000,000 to plaintiffs that suffered extreme pain for several minutes after being injured in the bombing of the Number 18 Egged bus); Flatow, 999 F Supp. 29 (awarding $1,000,000 for 3 to 5 hours of pain and suffering to plaintiff injured in another bus bombing); Mousa, Civil Action Number 00-2096 at 21 (awarding $12,000,000 for both past and future pain and suffering of plaintiff injured extensively in Number 18 Egged bus bombing); Snearl v. Mercer, 780 So.2d 563, 589-90 (La. Ct. App. 2001) (sustaining award of $5,000,000 for past and future pain and suffering of plaintiff that had extensive burn injuries and underwent numerous surgical procedures, including the amputation of both legs, after automobile accident); Eiland v. Westinghouse Electric Corp., 58 F.3d 176, 183 (5th Cir. 1995) (finding that $3,000,000 was the maximum amount that plaintiff could recover for the pain he endured and will endure as a result of severe burn wounds); Martin v. United States, 471 F. Supp 6 (D. Ariz. 1979) (awarding $1,000,000 and $750,000 respectively to two plaintiffs that endured a significant amount of pain after being severely burned in an accident involving a power line); Hysell, 599 F.2d at 471-72 (awarding $300,000 for past and future pain and suffering of plaintiff that was severely burned and had both legs and one arm amputated); Lynch, et al., v. Invacare Corp., Civil Action Number 99-CV-749 (E.D. Okl. 2000) (awarding plaintiff $24,000,000 in products liability case where plaintiff suffered extensive burn wounds and had his left arm amputated). Based on these and other similar cases, the Court finds that $10,000,000 is an appropriate amount of compensatory damages for the pain and suffering of Ira Weinstein.

(3) <u>Solatium</u>.  The FSIA provides for an award for solatium where physical injury results in death.  As this Court noted in <u>Flatow</u>, damages for solatium belong to the individual heir personally for injury to the feelings and loss of decedent's comfort and society.  The unexpected quality of a death may be taken into consideration in gauging the emotional impact to those left behind.  In this case, the impact upon Ira Weinstein's wife and three children was devastating.  Their testimony established conclusively that they each loved Ira Weinstein dearly and that they have experienced a tremendous amount of mental anguish as a result of his death.  Thus, the Court finds that the following amounts are appropriate compensation for this element of damages: Susan Weinstein: $8,000,000; Joseph Weinstein: $5,000,000; Jennifer Weinstein Hazi: $5,000,000; David Weinstein: $5,000,000.

(4) <u>Punitive Damages</u>:  Punitive damages are awarded to punish a defendant for particularly egregious conduct, and to serve as a deterrent to future conduct of the same type.  Restatement (Second) Torts, § 908 (defining punitive damages as "damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.").  As an initial matter, the Court must determine whether it can award punitive damages under the FSIA.  Based on the language of the statute and in accordance with the corresponding caselaw, the Court finds that it can levy punitive damages against the Iranian Ministry of Information and Security.[1]  The

---

[1]The plaintiffs also seek punitive damages against the Islamic Republic of Iran itself.  As the Court noted in <u>Elahi</u>, however, punitive damages may not be awarded against the Islamic Republic of Iran because "Congress recently repealed legislation that would have permitted punitive damages against a foreign state in cases, such as this one, brought under 28 U.S.C. § 1605(a)(7).  *See* P.L. No. 106-386, § 2002(f)(2) [October 28, 2000].  In so doing, Congress returned the law to its pre-1998 state, when it

FSIA specifically provides courts with the power to award punitive damages against an agency or instrumentality of a foreign state in a case brought under section 1605(a)(7). 28 U.S.C. § 1606. In this case, the Court finds that both of these requirements are easily satisfied. That is, the plaintiffs brought this action pursuant to 28 U.S.C. § 1605(a)(7) since it arises from the extrajudicial killing of Ira Weinstein, and the Iranian Ministry of Information and Security is an agency or instrumentality of the Islamic Republic of Iran for purposes of the FSIA. Anderson, 90 F. Supp.2d at 113; Elahi, 124 F. Supp.2d 113.

Having found that the FSIA authorizes it to award punitive damages, the Court still must determine whether such damages should be awarded in this case. According to the Restatement (Second) of Torts, punitive damages are merited in cases involving "outrageous conduct." In the instant case, the Court has no difficulty finding that the depraved and uncivilized conduct of the Iranian Ministry of Information and Security constitutes outrageous conduct. The defendant provided material support in the form of training and money to HAMAS so that the organization could carry out terrorist attacks such as the one on February 25, 1996. Under even the most restrictive interpretation of the term, the defendant's actions in this matter are clearly outrageous and warrant the imposition of punitive damages.

The Court must now determine the appropriate amount of punitive damages to award against the Iranian Ministry of Information and Security. In determining the amount of punitive

---

provided that a 'foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages[.]'" Elahi, 124 F.Supp.2d at 113 n.17. The Court's decision in Eisenfeld predated this statutory change. Thus, while the Court did award such damages in Eisenfeld, it cannot do so in the instant case.

-19-

damages to award, courts should consider several factors, including: "[1] the character of the defendant's act, [2] the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and [3] the wealth of the defendant." Restatement (Second) Torts § 908.  The Restatement (Second) of Torts provides that a fourth "factor that may affect the amount of punitive damages is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct.  It seems appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future, with greater weight being given to the prior awards."

With respect to the first factor—the character of the defendant's act—the Court has already detailed the heinous nature of the defendant's conduct in this case.  The defendant provided material support to HAMAS so that the organization could carry out terrorist acts such as the bombing of the Number 18 Egged bus.  It provided terrorists such as Hassan Salameh with both the technical knowledge and the funding necessary to carry out terrorist attacks like the one on February 25, 1996.  With respect to the second factor—the extent and nature of harm to the plaintiff—the severity of the injuries Ira Weinstein sustained as a result of the explosion was adequately explained above in the Court's Findings of Fact.  With respect to the third factor—the wealth of the defendant—the Court finds that the Iranian Ministry of Information and Security has substantial amounts of funds at its disposal.  The Iranian Ministry of Information and Security has approximately 30,000 employees and is the largest intelligence agency in the Middle East.  Aff. of Clawson  at ¶ 22.  Moreover, its annual budget is estimated to be between $100-$400 million.  Id.

Finally, with respect to the fourth factor, the Court has considered previous and potential future awards of punitive damages based on the defendant's conduct in this regard.  Specifically, the Court is aware of the fact that in two other cases brought under the FSIA as a result of the bombing of the Number 18 Egged bus, a total of $420,000,000 was awarded in punitive damages.  Notwithstanding the awards in these other cases, the Court finds that $150,000,000 in punitive damages is an appropriate award in this case.  In reaching this conclusion, the Court notes that "[n]o principle exists which prohibits a plaintiff from recovering punitive damages against a defendant or defendants simply because punitive damages have previously been awarded against the same defendant or the same defendants for the same conduct, or because other actions are pending against the defendant or defendants which could result in an award of punitive damages."  Speiser, Krause, and Gans, The American Law of Torts 828-29 (1985) (observing that "[i]n a number of product liability cases, involving usually drugs or motor vehicles, the courts have held or recognized that, notwithstanding the potential danger of awarding multiple punitive damages to separate plaintiffs bringing successive actions against a single defendant, successive awards of punitive damages are permissible.");  Scheufler v. General Host Corp., 126 F.3d 1261, 1272 (10th Cir. 1997) (stating that "although the United States Supreme Court recently emphasized the Due Process Clause of the Fourteenth Amendment prohibits a state from imposing grossly excessive punishment on a tortfeasor, it did not hold multiple punitive damage awards arising out of the same conduct are unconstitutional) (internal citation omitted);  Dunn v. Hovic, 1 F.3d 1371, 1387 (3d Cir. 1993) (noting that the "Restatement, which provides the most persuasive evidence of the common law 'as generally

-21-

understood and applied in the United States,' and which we are obliged to consult before

exercising whatever common law authority we have in this case, does not preclude successive

claims of punitive damages arising out of the same course of conduct, but instead permits

consideration of the existence of multiple punitive damages claims against a defendant as a factor

in accessing damages."). At the same time, the Court is cognizant of the fact that several

potential difficulties can arise when several plaintiffs seek punitive damages from one defendant.

In re TMI, 67 F.3d 1119, 1127-29 (3d Cir. 1995) (stating that "[a]s a practical matter we are, of

course, aware of the possibility that several large punitive damage awards here, as with any mass

tort litigation involving a limited fund, might deplete the fund."); Simpson v. Pittsburg Corning

Corp., 901 F.2d 277, 280-82 (2d Cir. 1990) (positing that multiple punitive damage awards may

be due process violation); Juzwin v. Amtorg Trading Corp., 705 F.Supp. 1053, 1055 (D.N.J.)

(noting that defendants "can be held liable over and over again for the same conduct, a result

which would be barred by virtue of the right against double jeopardy in a criminal matter.

Although an award in an individual case may be fair and reasonable, the cumulative effect of

such awards may not be[.]"). See also Kenneth R. Redden, Punitive Damages 118-120 (1980).

Nevertheless, the Court finds that a total award of $570,000,000 ($150,000,000 here,

$300,000,000 awarded to the plaintiffs in Eisenfeld, and $120,000,000 awarded to the plaintiff in

Mousa) is not excessive in light of the dual purposes of punitive damage awards (punishment and

deterrence), the facts established by clear and convincing evidence in this case, and the punitive

damage awards in other cases brought under the FSIA.[2]  Indeed, were the Court to hold

otherwise, it would be effectively limiting the defendant's exposure to punitive damages

precisely because it killed these individuals in one massive terrorist act as opposed to killing

them in three separate acts.  There is no persuasive, let alone controlling, legal authority to

support such a ruling.


**III.     CONCLUSION**

Today, the Court hopes to make whole, as much as legally possible, those hurt by the

death of Ira Weinstein.  Although judicial remedies will greatly support the plaintiffs' recovery,

full recovery can only be attained by each plaintiff in his own way.  Thus, for the foregoing

reasons, the Court finds that the plaintiffs have established, by clear and convincing evidence,

their claim or right to relief.

A separate order shall issue this date.

Date:  **2-6-02**

Royce C. Lamberth
United States District Judge

---

[2] In other cases brought under to the FSIA, courts have awarded $300,000,000 in punitive damages against the Iranian Ministry of Information and Security.  See e.g., Elahi, 124 F. Supp.2d at 114.

-23-